IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EDWARD F. (ROCKY) ROMANO and<br>CHARLES E. SOECHTING,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN MARCOS, *et al.*,<br><br>Defendants. | § § § § § § § § § § § § | 1:15-cv-839-RP |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment. (Dkt. 18). Having reviewed the parties' arguments, the factual record, and the relevant law, the Court issues the following order.

## BACKGROUND

Plaintiffs Rocky Romano ("Romano") and Charles E. Soechting ("Soechting") bring this civil rights action against Defendants City of San Marcos and various employees of its police department, including Chief of Police Chase Stapp, Assistant Chief Bob Klett, and officers Wade Parham, Don Lee, and Lee Harris (collectively "Defendants").

This controversy stems from the search of an airplane hangar owned by Plaintiffs Romano and Soechting on April 14, 2015. On that day, the United States Department of Homeland Security contacted the San Marcos Police Department ("SMPD") with a request that it investigate an airplane suspected of involvement in drug trafficking activity. Homeland Security purportedly informed SMPD that a narcotics canine unit had alerted on the plane during an open air search in the South Padre area, but that no narcotics were found and that probable cause was lacking. Defendants assert that Homeland Security intimated that narcotics could have been unloaded from the plane before the drug sniff, and that the plane could be carrying narcotics to San Marcos. Homeland Security

asked that SMPD send officers and a canine unit to investigate the plane upon its arrival in San Marcos. Defendants assert that the owner of the airplane was not identified during this call.

In response to the request from Homeland Security, SMPD Corporal Jesse Saavedra dispatched two SMPD police patrol units and a canine unit to assist in the investigation of the suspect plane at the San Marcos Municipal Airport. Saavedra states that he saw a plane on the tarmac upon his arrival that he confirmed the information provided by Homeland Security. The officers observed two men—later identified as the pilot and Romano—exit the plane and get into separate vehicles. SMPD officers later stopped the vehicles upon observing violations of the Texas Transportation Code. By the time Defendant Lee arrived with a drug dog to perform an open-air search, the plane had been placed in a hangar. The SMPD personnel left the airport by 6 p.m.

Saavedra briefed Defendant Harris on the call from Homeland Security and SMPD's resulting actions upon returning to the police station. Harris is a detective with the Hays County Narcotics Task Force and was, according to Defendants, the primary agent in charge of the investigation of the plane. Perceiving gaps in the investigation that required follow-up, Harris responded to the airport later that evening. While en route, Harris contacted Assistant Chief Klett to brief him on the matter and requested support from Lee, who would bring the drug dog, Odin.

Lee, Harris, and a third officer arrived at the airport around 9 p.m. Harris obtained identification of the hangar that housed the suspect plane while Lee performed a baseline canine sniff of two nearby hangars. Klett arrived during the baseline sniff and sought to determine who owned the suspect hangar. When Lee moved to perform a sniff search of the suspect hangar, he asserts that, consistent with his training, he checked each door to see if it was locked. He asserts that he found the back door unsecured. Meanwhile, Klett determined that Plaintiffs owned the hangar and advised the other officers on the scene of that fact. Because Harris had previously met

Soechting and had his cell phone number stored in his phone, he decided to call Soechting to inform him of what happened at the hangar.

Harris claims that he explained to Soechting that the officers found the back door unsecured and that Soechting consented to the officers' entering and searching the hangar. Soechting strongly denies this, claiming instead that he emphatically refused consent to search and instead told the officers to wait until he reached the airport. As an attorney, Soechting states that he keeps confidential client files in the hangar and for that reason would never consent to unsupervised access. Regardless, it appears to be undisputed that Harris informed the other officers that Soechting had consented to a search of the hangar. The officers then entered the hangar to perform a search. Defendants assert that Odin positively alerted at the seam of the compartment door above the wing of the plane. Harris purportedly told Soechting about this and Soechting then said he would come to the airport.

Soechting arrived at the airport to discover several officers in his hangar. While there, Soechting demanded that the doorknob to the hangar door be dusted for fingerprints. According to him, the door had been locked and must have been forced open, perhaps during a burglary. Parham refused to dust for fingerprints, reasoning that there was no indication that anything had been stolen and that, in any case, the only fingerprints on the doorknob were likely to belong to Harris, who had recently opened the door. Soechting later consented to a search of the aircraft. After the pilot arrived, the officers were allowed to enter the plane to search for the presence of narcotics. No narcotics were found and the parties have not suggested that any further law enforcement actions have taken place with respect to the Plaintiffs, the airplane, or the hangar.

Plaintiffs assert claims under 42 U.S.C. § 1983. They allege that the search violated their Fourth Amendment rights and that it was in retaliation for the exercise of their rights under the First Amendment.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). The court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## DISCUSSION

Defendants request summary judgment on the basis that the "probative evidence" establishes that Soechting consented to the officers' search activity and that there was thus no violation of his Fourth Amendment rights. Additionally, they argue that Plaintiffs have not put forth sufficient evidence to substantiate their retaliation claim. Finally, Defendants argue that Plaintiffs

have not provided evidence to establish municipal or supervisory liability. The Court will consider each of the constitutional violations before turning to the issue of municipal liability.

**1.      Fourth Amendment**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Supreme Court has repeatedly held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The exceptions to the warrant requirement that are relevant to this dispute are consent and exigent circumstances. *See United States v. Morales*, 171 F.3d 978, 981–83 (5th Cir. 1999).

It is undisputed that the officers had no warrant to search the hangar. Nor do Defendants contend that exigent circumstances justified the search. The legality of the search thus depends entirely on whether Soechting consented. On this question, a fact dispute exists. Defendants offer evidence that Soechting consented to their entry into the hangar, (Harris Depo. 40:1–12, Dkt. 18-4), while Plaintiffs offer evidence that he repeatedly refused consent. (*See, e.g.*, Pls.' Ex. B ("Elizabeth Soechting Decl."), Dkt. 22-1, at 64). The resolution of this dispute must be left to the factfinder.

Although the parties dispute whether consent was given, there is no dispute in the evidence that Harris told the other officers that Soechting provided consent. While not dispositive of whether Plaintiffs' Fourth Amendment rights were violated, the issue bears on whether the other officers are entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659

5

F.3d 359, 370 (5th Cir. 2011). There are two steps to determining whether a defendant is protected by qualified immunity. *See Saucier v. Katz*, 533 U.S. 194 (2001). First, the court asks whether the official "violated a statutory or constitutional right." *Morgan*, 659 F.3d at 371 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). Second, the court asks whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083). A court may, at its discretion, skip the first step and begin its analysis by asking whether the right in question was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Finally, "[e]ven if the government official's conduct violates a clearly established right, the official is entitled to qualified immunity if his conduct was objectively reasonable." *Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." *Id.* (internal citations omitted).

Here, the right to be free from non-consensual warrantless searches is clearly established. *Osborne v. Harris Cty.*, 97 F. Supp. 3d 911, 928 (S.D. Tex. 2015) ("The case law shows that at the time of the search, the right to be free from a warrantless forced entry and search, absent exigent circumstances, was clearly established."). Assuming Soechting clearly informed Harris that he did not consent to their entry into and search of his hangar, a reasonable officer in Harris's position would readily understand that proceeding with the search without a warrant or exigent circumstances would violate the Plaintiffs' clearly established rights. The other officers, however, had only Harris's representation that Soechting consented to a search. In this situation, the officers

6

might reasonably have believed that Soechting had permitted the search and that their actions were thus constitutionally permissible. *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."). Accordingly, the officers other than Harris are entitled to qualified immunity with respect to the initial entry into and search of Plaintiffs' hangar.

Likewise, the Court finds no evidence suggesting that Soechting's conduct after his arrival at the hangar would have put the officers on notice that their conduct was unlawful, which might have imposed liability on the officers for continuing their search. While Plaintiffs assert in their brief that Soechting informed the officers on the scene that he had not consented, the only evidence they cite—a portion of Soechting's deposition—does not support that assertion. (*See* Soechting Depo. 138:15–25, Dkt. 22-1).[1] On the contrary, Plaintiff at some point provided express consent to search the aircraft itself. (*Id.* 142:1–17). The officers who initially believed Soechting had consented would therefore have no reason to believe that continuing with the search after his arrival might be unlawful.

The Court thus concludes that, although there is a fact dispute concerning whether Soechting had consented to the search, the evidence compels a finding that each individual officer other than Harris is entitled to qualified immunity on this claim.

**2.    First Amendment Retaliation**

Defendants assert that Plaintiffs have provided no evidence that the Defendants engaged in retaliation, since the investigation of Plaintiffs' hangar was initiated on the request of Homeland Security and that Defendants were not even aware that the airplane or hangar was connected to Plaintiffs.

---

[1] In this portion of his deposition, Soechting recounts his conversation with Parham about dusting the doorknob for fingerprints due to suspected burglary.

7

To establish a First Amendment retaliation claim, Plaintiffs must show that "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002).

Assuming without deciding that both Plaintiffs had established that they engaged in constitutionally protected activity and that the unlawful search of their hangar would chill a person of ordinary firmness from continuing in that activity, the Court agrees with Defendants that Plaintiffs have not identified any evidence that the search—or any other relevant police activity—was motivated by their conduct.

On this point, Plaintiffs offer three arguments. First, they note that this element "presents a fact issue, unsuitable for summary judgment." (Pls.' Resp., Dkt. 22, at 13). However, like any fact issue, it is suitable for summary judgment when the party bearing the burden of proof puts forward no evidence to support it. *See* Fed. R. Civ. P. 56(e) (allowing courts to consider issue of fact undisputed where party fails to provide adequate support).[2] Second, Plaintiffs argue that "[v]indictive enforcement . . . of a law may be done with the objective of discouraging or punishing the exercise of one's constitutional rights." (Pls.' Resp., Dkt. 22, at 13). But the proposition that vindictive enforcement *may* be done for that reason is not evidence that the investigation *was* vindictive enforcement *actually* intended to punish Plaintiffs. Finally, Plaintiffs assert that there is evidence that at least some of the Defendants may have been aware which hangar belonged to Soechting. (*Id.*). Yet the evidence they cite as support is only Soechting's speculation that

---

[2] Plaintiffs' sole authority for their argument is *Lott v. Andrews Center*, 259 F. Supp. 2d 564 (E.D. Tex. 2003). That authority merely provides that the "motivating factor" element is inappropriate for resolution on a *motion to dismiss* prior to discovery. Even then, the plaintiff must still plead something more than speculation or personal belief. *Jones v. Greinger*, 188 F.3d 322, 325 (5th Cir. 1999). The Court here is not concerned with a motion to dismiss and the parties have had a full opportunity for discovery.

Defendants may have become aware that he owned the hangar *after* they entered it, since his filing cabinets listed his name prominently. (Soechting Depo. 181:25–183:3). Even if the evidence established that Defendants had some awareness that Soechting owned the hangar, this would establish only the conditions necessary for Defendants' actions to have been retaliatory. No evidence beyond speculation nudges this fact toward a plausible inference that Defendants' conduct was, in fact, motivated by Plaintiffs' conduct.

The Court concludes that Plaintiffs have not established a genuine and material fact dispute on the issue of motivation, and Defendants are therefore entitled to summary judgment as to Plaintiffs' retaliation claim. *See Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

**3.     Municipal Liability**

Plaintiffs seek to hold the City of San Marcos liable for the allegedly unconstitutional search of their hangar,[3] along with Chief Stapp and Assistant Chief Klett for their alleged failure to train and supervise their officers. Defendants contend that Plaintiffs' evidence does not furnish a valid basis for municipal or supervisory liability.

It is well established that "[l]iability under the doctrine of *respondeat superior* is not cognizable in § 1983 actions." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010). However, supervisors and municipalities may be liable for constitutional violations that result from their own wrongdoing. *See id.* Liability and supervisory liability may be established by showing, "in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury," and that the policy was adopted "with deliberate indifference to the known or obvious fact that such constitutional

---

[3] Because Plaintiffs failed to establish a viable claim for First Amendment retaliation, it is unnecessary for the Court to consider municipal or supervisory liability with respect to this claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that municipal liability is unavailable if no constitutional violation is established).

violations would result." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)). A failure to adopt a policy can also support liability, but "such omission must amount to an intentional choice, not merely an unintentionally negligent oversight." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992). Liability can also be established under a failure-to-train theory, which requires the plaintiff to establish that: (1) the defendant's training policy procedures were inadequate, (2) the defendant was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the constitutional violation. *Sanders-Burns*, 594 F.3d at 381.

The Court agrees with Defendants that Plaintiffs have put forward insufficient evidence of a policy, custom, or a failure to train that was the moving force behind their alleged constitutional violation. Plaintiffs offer several pieces of evidence, but none creates a genuine fact dispute. The first is an expert report of Gary Stone, a retired Assistant Chief of Criminal Law Enforcement for the Texas Department of Public Safety. The report offers only conclusory assertions that "the officers['] actions in executing the search, record keeping of the search and efforts to conceal the events of that day, each, independently deviates from well established training and standards applying to police officers undertaking these actions." (Stone Report, Dkt. 22-1, at 349). It continues by noting that officers should investigate wrongdoing within the confines of the Constitution and that the search at issue here "was illegal and [in] violation of the Plaintiffs' rights to be free from unlawful searches." (*Id.* at 350). The report is far too conclusory to offer any support to Plaintiffs. *See Stagliano v. Cincinnati Ins. Co.*, 633 F. App'x 217, 219–20 (5th Cir. 2015) ("There is a level of conclusoriness below which an affidavit must not sink if it is to provide the basis for a genuine issue of material fact, and unsupported expert affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment.") (internal quotations, citations, and alterations omitted).

10

The next evidence Plaintiffs have identified is Chief Stapp's deposition testimony wherein he confirms that SMPD had no particular policy regarding having witnesses to or recordings of oral consent to a search, or follow-up written consent after oral consent is given. (Stapp Depo. 38:14–20). While obtaining written confirmation or having a witness might be advisable as a matter of best practices, "best practices 'do not establish constitutional minima.'" *Brown v. Timmerman-Cooper*, No. 2:10-cv-283, 2013 WL 430262, at *4 (S.D. Ohio Feb. 4, 2013); *Miles v. Bell*, 621 F. Supp. 51, 60 (D. Conn. 1985). Voluntary oral consent provides constitutionally adequate justification for a warrantless search whether or not the consent is recorded or later confirmed in writing. Moreover, Plaintiffs here allege that each of the officers proceeded with an illegal search despite knowledge that Soechting repeatedly and unequivocally objected. The failure to record consent was thus not the moving force behind the claimed violation. Rather, it was the officers' alleged deliberate disregard of the lack of consent. While having Soechting's consent or objection recorded might have made this litigation more straightforward, it would not have prevented the unlawful search of Plaintiffs' hangar.

Plaintiffs next point to the deposition testimony of Parham establishing that the Narcotics Task Force does not have regularly scheduled meetings to discuss its open investigations. (Parham Depo. 9:2–4, Dkt. 22-1). Plaintiffs also point to testimony showing that officers selected for the task force receive on-the-job training lasting between two weeks to two months, along with additional classroom instruction. (*Id.* 11:21–12:10).[4] The relation of these facts to the matter at hand is unclear. Lacking any explanation from the Plaintiffs, (*see* Pls.' Resp., Dkt. 22, at 16), the Court is unable to imagine that regular meetings to coordinate task force activity would have prevented the allegedly

---

[4] Curiously, to support the claim that the officers "do not receive specialized training by the city, but instead are thrust into simple on-the-job training," Plaintiffs also cite the deposition testimony of Defendant Harris. Harris testified that he attended "narcotics detective school" and received on-the-job training for several months thereafter. (Harris Depo. 9:2–24, Dkt. 22-1). While technically true that the training was not provided "by the city," (Pls.' Resp., Dkt. 22, at 15; Harris Depo. 10:2–3, Dkt. 22-1), the apparent suggestion that the city expected only on-the-job training is misleading.

11

unlawful search, and the Court will not hazard a guess as to what about the on-the-job and classroom training offered to task-force members Plaintiffs feel is inadequate.

Plaintiffs finally point out that Assistant Chief Klett did not supervise or control Harris's activity while at the hangar on April 14, 2015. However, in this instance, Klett may be responsible for failing to control Harris's actions only if Klett was aware that Harris had a propensity to engage in unlawful searches. *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) ("A plaintiff seeking recovery under a failure to train or supervise rationale must prove that the police chief failed to control an officer's 'known propensity for the improper use of force'") (quoting *Sims v. Adams*, 537 F.2d 829, 832 (5th Cir. 1976)). Plaintiffs have neither alleged nor offered evidence to prove that Harris had a propensity for unlawful searches of which Klett was aware. Klett is therefore not liable under § 1983 for his failure to supervise or control Harris's actions in conducting a search of Plaintiffs' hangar. *See id.*

Plaintiffs' failure to provide sufficient evidence of an inadequate policy or training that was the moving force behind the alleged unlawful search is fatal to municipal or supervisory liability. The court therefore grants summary judgment to Stapp, Klett, and the City on these claims.[5]

---

[5] The Court additionally finds the evidence insufficiently establishes the necessary element of deliberate indifference. However, Defendants did not challenge Plaintiffs' showing in that regard and the Court accordingly bases its decision on other grounds.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion for Summary Judgment. (Dkt. 18). The motion is **DENIED** as to Plaintiffs' Fourth Amendment claim against Defendant Harris in his individual capacity. The motion is **GRANTED** in all other respects.

Each defendant other than Harris is accordingly **DISMISSED** from this action.

**SIGNED** on September 11, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE